[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On July 6, 1990, more than a year after having been removed from her parents' custody following their arrest for possession of drugs, two year old Amanda M. became the subject of this petition by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Jean D. and John M., her mother and acknowledged father, pursuant to Sec. 17-38a of the Conn. Gen. Stats. (Rev. 1989), now 17a-112
(Rev. 1991), applicable to children previously committed to DCYS as was Amanda on October 4, 1989, as neglected or uncared for. Grounds alleged as to the father are abandonment, failure to rehabilitate and the absence of parent-child relationship. As to the mother only the latter two grounds are alleged. An amendment to the pleadings granted January 2, 1991 alleges more current facts but adds no further statutory grounds for the relief sought.
In the initial hearing on the petition held August 3, 1990, service was confirmed on both parents and the court granted the petitioner's motion to update a psychological evaluation that had been conducted in November of 1989 in CT Page 3534 connection with litigation concerning a younger child. (See Trial Memorandum In Re Valerie M., attached.) Following receipt of the completed evaluation, a trial date certain was set for January 23, 1991, at which time both parents appeared with their separate court-appointed attorneys. At the conclusion of that hearing a second trial day was set for February 13, 1991. On that occasion John M. failed to appear, his whereabouts having become unknown in the interim. In the absence of a proferred excuse for his nonappearance or assurance of his availability at any subsequent trial date, the trial was concluded in his absence. A petition seeking to extend Amanda's original commitment filed by the petitioner on January 16, 1991, to which the mother agreed on February 13, 1991, had been served on the father by publication. He failed to appear for the hearing on that petition on February 27, 1991.
Following completion of trial on February 13, 1991 the parties were given permission to file trial memoranda by March 27, 1991 which is, therefore, the date on which the period of reserved decision is deemed to have commenced.
Facts
Evidence offered in two trial days, interpreted in the light of the prior court record concerning this child and her parents, of which judicial notice is taken, supports the finding of the following facts: Jean D. met John M. at the age of fifteen, four years after she had begun using drugs at the age of eleven. (Testimony of respondent mother, February 13, 1991.) At sixteen, having left school and home, she began living with him. Because of damage to his nose from snorting cocaine, John began to inject the drug intravenously. Although not similarly damaged, Jean too began intravenous injection of cocaine at the same time. Having terminated an earlier pregnancy, Jean became pregnant with Amanda in the late summer of 1987. She did not visit an obstetrician until December of 1987 at which time, learning of her long history of substance abuse, the doctor instructed her in the dangers to a fetus of continued drug use. Jean was able to lessen her drug abuse so that Amanda was born on May 12, 1988, displaying no apparent problem as a result of her mother's use of tobacco, alcohol, marijuana and cocaine. Three months after the baby's birth, however, Jean resumed using cocaine, both by smoking and intravenous injections, two to five times a week. (Testimony of respondent mother in case of Valerie M., January 17, 1990.) When Amanda was five months old (two months after Jean resumed drug abuse) she became pregnant with Valerie. Again she did not seek prenatal care until her pregnancy was in the second trimester. In March of 1989 the CT Page 3535 obstetrician again discussed substance abuse and its problems for the unborn. Although informing the doctor that she had stopped using cocaine and was only using beer and marijuana, in the subsequent trial concerning Valerie she testified that this was, in fact, not true and that she had been unable to stop using cocaine. She did not seek further prenatal care until one month before giving birth to Valerie.
A month before the birth of their second child, the parents were arrested after being found in a home containing marijuana and drug paraphenalia where 13-month old Amanda was lying on a floor alongside pieces of glass from a broken window. John's probation officer, who made the arrest, testified "I almost stumbled over the kid." (Testimony of Probation Officer Fragione in case of Valerie M., December 12, 1989.) When the parents both refused to place Amanda voluntarily or to enter into drug treatment, DCYS filed a petition alleging her to be neglected and securing an Order of Temporary Custody (OTC) so that she could be placed in foster care. In the 10 day hearing on the OTC, the parents agreed to its continuance pending their securing of counsel. On the date set for the entry of pleas on Amanda's petition, the parents called the court at the appointed hour to ask for a continuance since Jean's water had broken and she was going to the hospital to deliver her child. It was later learned that Jean was at home when the call was made, injecting a quarter-gram of cocaine because "It was right there" and she "could not refuse" to use it. (Testimony of respondant mother, case of Valerie M., January 17, 1990). She did not enter the hospital until eight hours later when the baby was delivered precipitately, in danger of succumbing to the inhalation of mecomium as a result of the injection of cocaine during labor. (Testimony of Dr. Hodder, case of Valerie M., December 13, 1989.) Co-terminous petitions were subsequently filed on Valerie pursuant to subsection (e) of Sec. 17-43a and, after extended hearings, a decision was rendered on March 28, 1990, articulation of which is attached hereto. An appeal from that decision is currently pending.
At the continued hearing on Amanda held on October 4, 1989, John was hospitalized for in-patient drug treatment but Jean appeared and admitted that Amanda had been living under circumstances injurious to her well-being at the time of her placement in temporary custody. An adjudication of neglect was made by Jean's admission and by default on the part of John, without objection by his counsel, and Amanda was committed to DCYS for an initial period of 18 months pursuant to subsection (d) of Sec. 46b-129. (With Jean's agreement on February 13, 1991, and by default of John on February 27, 1991, commitment was extended without prejudice to the right to the relief CT Page 3536 sought by the petitioner in the instant action, or to the rights of the parents pending final resolution of that action.)
At the time of commitment, expectations were spelled out by the court, fulfillment of which would maximize the chances for reunification of the family. (State's Exh. F., February 13, 1991). The list of expectations was signed by Jean and her attorney as well as by counsel for the father and the child. The expectations included visiting the child as often as permitted, the securing of adequate income and housing, the avoidance of substance abuse and further involvement with the criminal justice system, and the completion of drug programs that each parent was then involved in: For Jean it was the Bristol Hospital outpatient program (Jean having refused an inpatient program), and for John an inpatient program that he had entered shortly before that court hearing.
In the fifteen months between the date of Amanda's commitment and the adjudicatory date of January 2, 1991, when this petition was last amended, both parents continued to abuse drugs, neither had followed through on drug treatment, neither had secured a sustained source of income or housing other than in prison, residential treatment, or the homes of others, and both had had further involvements with the criminal courts. John did not visit Amanda at all after February of 1990 and when he was incarcerated in August of 1990 he did not inform DCYS nor request any kind of contact with his daughter. Soon after his release from prison in December of 1990 he appeared in court in this proceeding, but following the first trial date his whereabouts became unknown both to DCYS and to his attorney, and he failed to appear at all subsequent hearings concerning this child. Jean visited often in the early months of Amanda's placement, but dropped to one visit a month from January to May of 1990 because "At that time my life was just falling apart." (Testimony of respondent mother, February 13, 1991.) Visits continued to be monthly until September when Jean completed a three-month program in a Christian residence in another city, at which time this petition was pending
Neither parent secured drug treatment on an on-going basis. John entered an inpatient program at the time Amanda was committed in October of 1989 but left against advice after only 16 days. On his departure he was recommended to a year-long follow-up continuing care program which he declined. During his brief period as an inpatient, his acceptance of the program was minimal and he resisted confronting the consequences of his continued use of both cocaine and marijuana, including the loss of both children. (Testimony of DeMatteis, January 23, 1991.) The drug counsellor testified that his poor attitude and a long history of multiple relapses CT Page 3537 following previous prematurely terminated drug treatment programs supported the conclusion that his prognosis for future rehabilitation was poor. (Id.) By her own admission, Jean continued to use drugs in the spring of 1990 and again, in combination with alcohol, as recently as late November of 1990. (State's Exh. B; testimony of Officer Carello February 13, 1991.)
Two months after Amanda's commitment to DCYS, Jean was sentenced to a year suspended with two years probation conditioned upon her obtaining an evaluation of her drug problem and thereafter compliance with the recommended treatment. Her probation officer referred her to the Counselling Center in Bristol in early 1990, but Jean never went. In June of 1990 Jean asked her probation officer to approve her entry into Simon House, a Christian home for women, "so we'd get off her back" about entering drug treatment. (Testimony of Probation Officer Shea January 23, 1991.) Although this was not a drug treatment facility and lacked the capacity for securing random drug screens of its residents, the probation officer approved this placement in lieu of the drug treatment that had been ordered. Less than three months after completing the Simon House program, Jean was arrested for attempting to possess narcotics. More than a month after that arrest, on January 7, 1991 — fifteen months after Amanda's commitment; nineteen months after Amanda's removal from her parents' custody because of their drug involvement — Jean, for the first time, secured an evaluation at an appropriate drug treatment agency, Wheeler Clinic. She was placed in a weekly counselling program and out of the first two scheduled appointments she had cancelled one. Probation Officer Shea testified that while many of her probationers were required to enter drug treatment as a condition of probation, it was unusual for them to do nothing whatever to bring themselves within compliance of that condition for over a year.
Jean was arrested again on November 29, 1990, for conspiracy to possess narcotics. The officer who made the arrest testified that Jean had been a passenger in a car driving through an area of high drug sales and was observed exchanging $20 with an undercover officer for a "nugget" of what was represented to be crack cocaine. Seeing the approach of the arresting officer, who was known to her in connection with her work as a police informant earlier in the year, Jean proceeded to swallow the nugget. (Testimony of officer Carello, February 13, 1991; State's Exh. C.)) At the time of her arrest Jean claimed that she had been "clean" for the three preceding months (Id.), supporting the inference that she had last used drugs in late August while still a resident of Simon House. In April of 1990 this police officer had observed her CT Page 3538 making a purchase from a known drug dealer but withheld arrest when Jean offered to serve as an informant on drug investigations for the Bristol Police, which she did for financial compensation until August of 1990.
Jean admitted to the DCYS social worker that she had used drugs in April of 1990, ten months after Amanda had been removed from her care. (Testimony of Dayner, February 13, 1991) In a telephone conversation with the same social worker on December 12, 1990, Jean also admitted that she had "slipped" on the occasion of her arrest in November, explaining that she had been "stressed" because of having been served with a subpoena and had gone drinking with a friend who later accompanied her on the trip to buy drugs. This had occurred at a time that she later admitted she had been pregnant, a condition that had ended prior to the time of trial. She also admitted that she had sought no drug treatment until January of 1991, nearly six months after being served with the instant petition. Prior to that time she had elected instead to enter the three month Simon House program, although admittedly not a drug treatment facility, and thereafter to counsel with her pastor three times a week for four months. That counselling, too, had stopped abruptly in January of 1991 because of a "personal problem. . . over me dating people. . . He didn't want me to date anyone for a year."
Neither parent had secured housing of their own in the 18 months between Amanda's removal and the adjudicatory date of this action. John had spent four months incarcerated; Jean had spent three in Simon House. The rest of the time they had each stayed with their respective relatives, and, in John's case, his whereabouts were from time to time unknown. At the time the trial concluded, John was once again whereabouts unknown. Jean was living with her mother whose home had never previously been offered for Amanda. Asked at trial if there was even the possibility that Jean could bring Amanda to live with her at the maternal grandmother's house, Jean replied "I haven't discussed it thoroughly with her."
In their first clinical evaluation in November of 1989 both parents had admitted that they would have to stay sober for one full year before they could count on continued sobriety. (State's Exh A, p. 5) The psychologist then found that:
 Substance abuse is the major precipitating problem for the psychosocial dysfunction of both parents and is a major handicap to their ability to discharge responsibility to themselves, to each other, and to their CT Page 3539 child . . . both parents are immature, hedonistic, irresponsible, and not reliable as caretakers for themselves or for others. They do not have a satisfactory domicile, a reliable source of income, nor the habits and attitudes that are sufficient for independent existence and for the establishment of a satisfactory family life. Their drug rehabilitation is of recent origin and not yet stabilized. (State's Exh. A., p. 8)
Although conducted in connection with the litigation concerning the younger child, the evaluator stated that "these recommendations also apply to the older child, Amanda." (Id.)
The parents were re-evaluated in September and October of 1990 during John's most recent incarceration and at the end of Jean's three months residence at Simon House. The psychologist found that "It is too soon to determine the reliability of the remission of these symptoms", most of which were consequences of their habitual substance abuse, and concluded that after 16 months in foster care, having come to recognize her present foster parents as her psychological parents, "the needs of the child require that she remain in the permanent care of these foster parents." (Id. p. 9) While the child interacted easily with both parents, he saw no evidence of a parent-child relationship with either but rather that of a young child interacting pleasantly with any interested adult. (Testimony of Dr. Mantell, January 13, 1991). He found it significant that in November of 1989 both parents had agreed that one year of sobriety would have to precede their resumption of child care, yet both had continued to use drugs for months after that evaluation. He found Jean's lack of insight as to the impact of her drug use on her health and mind was "a form of denial". (Id.) To make Amanda, now two and one-half, wait another year before knowing who her permanent family was to be would be a "cruel thing to do to a child." (Id.) He found it significant that Jean claimed to be visiting Amanda weekly and had not revealed or complained about the fact that she had been restricted to monthly visits. Even if the parents' pattern could eventually change to the point that their rehabilitation could sustain for a full year, termination of parental rights without more delay was required to secure the child's best interests. After being separated from her at the age of one year for a period of 18 months, the evaluator testified that he ". . .cannot support the notion of more waiting with an uncertain result." (Id.)
Disposition: On facts as of January 2, 1991
Father: The foregoing record provides clear and convincing CT Page 3540 proof of all three grounds pleaded for terminating the prenatal rights of John M.
— John M. visited his daughter approximately eight times from the time of her placement until February of 1990. After that date all visiting ceased. No request was made for DCYS to help with transportation. From February to August of 1990 John was in the community but made no effort to see or contact his daughter in any way, even on her second birthday. In August of 1990 he became incarcerated but informed neither DCYS nor his attorney in this action. While incarceration does not constitute abandonment per se of a committed child (In re Juvenile Appeal, #10155, 187 Conn. 431 (1982)) it is possible to find abandonment by an incarcerated parent who does nothing to initiate contact with a child or the child's caretakers. (Id.) John's total absence from his child's life for 11 months prior to the adjudicatory date constitutes abandonment, as defined in Sec. 17-43a as a failure ". . .to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
— Expectations were spelled out for both parents at the time of Amanda's commitment on October 4, 1989. Although John was not present at that hearing, his attorney signed the expectations in his place. (State's Exh. F.) John failed to comply with any one of them. He did not maintain contact with DCYS; he did not visit the child; he did not complete a substance abuse program; he has never secured a steady and adequate source of income; he has never obtained adequate or continuous housing; he has continued substance abuse and has had further involvement with the criminal justice system that resulted in four months of incarceration. This constitutes clear and convincing proof that he has ". . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [he] could assume a responsible position in the life of the child."
— A year after Amanda's commitment, the clinical evaluator found ". . . no evidence of an ongoing parent and child relationship between either parent and child." (State's Exh. B., p. 8.) Amanda, a pleasant, affectionate and pliable child, related nicely to both parents, but with a reserve notable for its absence in interaction with her foster parents. (ID.) Considering that John stopped all contact both with Amanda and with DCYS in February of 1990, and a year later his whereabouts were unknown, it is clear that not only is there presently no ongoing parent-child relationship between Amanda and her father, but it is equally clear that "to allow further time for the establishment or reestablishment of such parent-child CT Page 3541 relationship would be detrimental to the best interest of the child" whose. . .
 . . . needs . . . require that she remain in the permanent care of these foster parents. To do otherwise with her would jeopardize the child's psychological stability in a basic way and cause trauma from which the child is unlikely to recover. (State's Exh. B., p. 8.)
Mother: The petitioner has only argued for a single ground to terminate the parental rights of the mother: Failure to rehabilitate. For the fifteen months between the date of commitment and the adjudicatory date, Jean's pattern has not significantly changed: She continues to use cocaine, albeit less frequently than at the time of Amanda's original placement in foster care. Jean's credibility as to her present sobriety, stability and self-sufficiency is undermined by the many departures from fact in her statements to others: She told Dr. Mantell she was in a drug treatment program; Simon House is not a drug treatment program. She told Dr. Mantell she visited Amanda weekly; visitation has not been more often than monthly since January of 1990. She claimed that her last drug use prior to the November 29, 1990 episode had been in April of 1990 (Id., p. 2); she told the arresting officer that she had been "clean" for only the three months preceding her November arrest. (Testimony of Officer Carello, February 13, 1991.) She provided no evidence to corroborate her present employment of recent duration, or the availability of her mother's home for Amanda. By her own admission, she had been pregnant at the time of her most recent use of cocaine in November of 1990, notwithstanding the impact of her addiction on her children, born and unborn, over the two preceding years. This record provides clear and convincing proof that Jean, also, a parent ". . . of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding . . . [has] failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child." (Sec. 17-43a, subsection (b); emphasis added.)
While the state in its trial brief did not argue the parent-child relationship ground for terminating Jean's parental rights, it appears to have been pleaded in the original petition and the record would support it by the requisite clear and convincing proof: Amanda last lived with her mother in June of 1990 when she was 13 months old. After a few months of frequent visitation which, if continued, could have sustained a parent-child relationship, Jean voluntarily CT Page 3542 reduced her contacts to once a month for the next nine months. After Jean left Simon House in September of 1990 the child's foster placement had changed and monthly visitation was continued since this petition was then pending. Even though her interaction with Jean was, as with her father, apparently pleasant for the child, it did not suggest to the clinical evaluator a parent-child relationship: She initially related to her mother "in a rather obliging fashion which lacked spontaneity and affection"; she did not initiate overt signs of affection; even after she became more natural with her mother, Amanda "appeared to relate to her as if the mother were a very nice person who had come to play with her." (State's Exh. B., pp. 5-6.) The conclusion was that there was no evidence of an ongoing parent and child relationship with either parent. (Id., p. 8.) Considering Jean's failure to achieve either sobriety or stability in the year and a half since Amanda's removal from her care, it is as clear and convincing as it was with John that "to allow further time for the . . . reestablishment of such parent-child relationship would be detrimental to the best interest of the child." The fact that Jean had visited the child every month for a year and that the visits had not been problematic for the child does not preclude this finding. Indeed, the Supreme Court has recently cited with approval a case in which this ground had been upheld despite the fact that a mother had visited her three year old child twice a month for seven months, affirming the trial court's finding an absence of a parent-child bond ". . . despite the fact that the mother had maintained contact with her son through visitation." In Re Jessica M. 217 Conn. 459, 469
(1991), citing In Re Juvenile Appeal (Anon.), 181 Conn. 638
(1980).
Disposition — on facts as of final trial date, 2/13/91
No significant changes took place in the circumstances of parents or child in the period between the adjudicatory date and the final trial date except that John's whereabouts had again become unknown, and Jean had cancelled the second of two appointments for drug treatment.
Before the court may consider what disposition is in the child's best interests it must consider the six factors set forth in subsection (d) of Sec. 17-43a:
 (1) The only services that could be offered the parents was facilitation of visitation and recommendations for drug treatment. Visitation was never refused to either parent except that an increase in the frequency of visits by the mother from monthly to weekly was denied in September of 1990 due to the CT Page 3543 pendency of this petition and the difficulty of providing visits for both the DCYS worker and the child. Under these circumstances, limiting the frequency of Jean's visits to that which she had voluntarily adopted from January to September of 1990 was not unreasonable. Both parents were fully aware of the many treatment possibilities for their drug problems. No other services were requested or indicated.
 (2) No court orders were imposed upon the parents, but the expectations spelled out at the time of Amanda's commitment were wholly unfulfilled with regard to the father, and unfulfilled in the most essential elements (drug treatment; securing of stability) with regard to Jean.
 (3) The only clinical evidence in this case was unequivocal that the child enjoys visits with the parents as with any visiting adult, but clearly identifies the foster family as her only significant parental figures.
 (4) Amanda will soon be three years old. She lived with her parents only for the first 13 months of her life — months in which both parents injected cocaine at least several times a week, leading to an inference that the care she received during those 13 months was less than optimal. She has lived away from her parents for nearly two years and is currently enjoying the security of living in a family which provides her with excellent care and is committed to her for life. To remove her at her present age for placement with parents who are little more rehabilitated than they were at the time of her removal, or to permit her to remain with these foster parents still longer with the constant knowledge that she could be taken away from them at any time, would be, as the psychologist put it "cruel".
 (5) John has made no apparent effort to adjust his circumstances, conduct or conditions to make it in Amanda's best interest to return to his care in the foreseeable future. His only period of physical stability and sobriety was during his most recent four month incarceration. When not incarcerated he continues to be homeless, jobless, uninvolved in drug treatment and apparently disinterested in the circumstances CT Page 3544 of his child. Jean, during the first 18 months of Amanda's placement, entered no drug treatment program and continues moving from one person's home to another, wholly dependent at the last hearing on her parents for both employment and housing. While she did achieve periods of sobriety, lived in a Christian home for three months, and cooperated with the police in drug investigations for a period of four months, none of those circumstances were sustained: Three months after the initiation of this action to terminate her parental rights Jean became "stressed" and turned to alcohol and cocaine once again, leading to yet another involvement with the criminal law. She has maintained contact with Amanda, but not with the frequency that she could have enjoyed for most of the period of Amanda's commitment.
 (6) Nothing prevented either parent from maintaining a meaningful relationship with Amanda during her months of placement in foster care. John chose to discontinue contact three months after Amanda's commitment and failed to communicate either to his attorney or to the DCYS social worker any request for assistance in maintaining contact or explanation for its discontinuance. Jean visited frequently in the earlier months of Amanda's placement, but chose to cut back to monthly contact in 1990, first because of her own life problems, and then because she elected to enter a program outside of the area (that was not a drug treatment program). Had she entered the drug program to which her probation officer had referred her in January of 1990, she could have maintained at least weekly contact with her child.
Having considered the foregoing and with the unrefuted clinical evidence as to what course of action will best serve the needs of this little girl, it is found by clear and convincing proof to be in Amanda's best interests for her parents' rights to be terminated so that she may never have to know again the trauma of removal from her principal caretakers. Therefore, its is ORDERED that the parental rights of John M. and Jean D. in their daughter Amanda M. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption, and that such Commissioner shall submit a written report to this court as to the progress toward such adoption no later than 90 days after the date of this judgment, and thereafter CT Page 3545 at such frequency and in such form as this court may from time to time require. And it is further ORDERED that if Amanda's adoption is not then finalized, such Commissioner shall file a Motion to Review Plan for Terminated Child no later than August 1, 1992, to be in conformity with the requirements of Federal law.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If either decides to pursue an appeal and their counsel at trial is willing to represent them in it, this court will appoint him to act as appellate counsel at public expense until all appellate process is completed. If, however, in the exercise of his professional judgment as an officer of the Superior Court, he declines to perfect such appeal because, in his opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The parent will then be informed by the court clerk that there is the balance of the 40 days in which to secure their own counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501
(1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if, after the public defender at trial notifies both client and court that "he could not conscientiously proceed with the appeal," another attorney is appointed to consider the merits of the appeal and comes to the same conclusion. Even a convicted criminal defendant "cannot demand that the trial court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do so. Fredericks v. Reincke, 152 Conn. at 505. If such procedure satisfies the sixth amendment right to counsel where the only conflicting interests are those of a defendant who seeks review of his conviction and of the state which has a legitimate interest in avoiding the expense and judicial burden of meritless appeals, it is a fortiori appropriate where there are interests of third parties involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a degree of consideration as those of his parent whose CT Page 3546 right to raise him, brought into question because of past acts of omission, is at issue. Even an unsuccessful appeal could delay permanent planning for these children for years since no child may be adopted until the appellate process is exhausted and the termination order final.
If an appeal should be taken, the judgment of termination shall be stayed during its pendency, but throughout this period all decisions made by DCYS, as the children's continuing legal guardian, as to contacts with her natural parents shall be based solely upon the children's best interests, not upon the parents' or the lingering possibility of an eventual reunification. Whatever obligation is imposed upon DCYS by federal and state law to make continuing efforts to reunite committed children with natural parents ends upon a judicial finding that grounds exist to terminate parental rights.
Entered at Plainville this 30th day of April, 1991.
Brenneman, J.
Copies of the Trial Memorandum In Re Valerie M. are available upon request.